# Obligation of Revolving Funds Requiring Reimbursement from Time-Limited Funds Under the Anti-Deficiency Act

The Anti-Deficiency Act prohibits an agency from awarding a severable services contract that lasts longer than one year and obligates revolving funds that must be reimbursed with time-limited funds.

The Anti-Deficiency Act violation caused by awarding such a contract is not undone by subsequently modifying the contract's term so as not to exceed one year.

October 21, 2013

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION*

The Anti-Deficiency Act prohibits "officer[s] or employee[s] of the United States Government" from "involv[ing] . . . [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341 (2006). You have asked whether an agency violates the Anti-Deficiency Act (codified at 31 U.S.C. §§ 1341–1342, 1349–1351, 1511–1519) ("ADA" or "Act") when it awards a severable services contract with a performance period that exceeds one year and the contract obligates revolving funds that an agency has a legal obligation to reimburse with time-limited funds.[1] If we conclude that such an action violates the ADA, you have also asked whether an agency can cure the violation by modifying the contract so that the performance period lasts only one year.

In federal appropriations law, services are considered "severable" if they are continuing and confer a benefit each time they are rendered. Section 3902(a) of title 41 of the U.S. Code allows a contract for severa-

---

* Editor's Note: This is a revised version of an opinion issued on July 8, 2013. *See infra* note 7.

[1] *See* Letter for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from Kris E. Durmer, General Counsel, General Services Administration (Aug. 29, 2012) ("GSA Letter"). In preparing this opinion, we also considered views provided by the Department of Homeland Security. *See* Letter for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from Audrey J. Anderson, Deputy General Counsel, Department of Homeland Security (Nov. 29, 2012) ("DHS Letter").

ble services that obligates time-limited funds to extend beyond the period of availability of those funds, provided that the total length of the contract for such services does not exceed one year. 41 U.S.C. § 3902(a) (2006 & Supp. V 2012). By contrast, a contract that obligates only revolving funds would not generally be subject to this one-year limit. 31 U.S.C. § 1502(a). Thus, to resolve your first question, we must consider whether the statutory rule that contracts for severable services be limited to one year applies to contracts that obligate revolving funds in circumstances where an agency must reimburse those revolving funds with time-limited funds that are unavailable for obligation beyond a one-year period. In our view, it does. In such a case, the contract has the effect of obligating those time-limited funds for reimbursement in advance of an appropriation and thus violates the Anti-Deficiency Act. *Id.* § 1341.

We also conclude that an agency cannot cure an ADA violation of this type by subsequently shortening the contract's performance period. We recognize that an agency can cure the type of ADA violation that occurs when an expenditure is charged to the wrong account, so long as funds were legally available at the time of obligation. In the example you have described, however, no funds were legally available at the time of obligation to reimburse payments on a greater-than-one-year contract. In circumstances such as these, the violation can be limited but not cured.

## I.

We begin by noting that the practice of this Office is to address only general legal questions having prospective application. We thus set forth and analyze the following information, such as the agreement between the Department of Homeland Security ("DHS") and the General Services Administration ("GSA") and the subsequent contractual arrangements and findings of GSA's Office of the Inspector General, solely for illustrative purposes and to provide relevant context. We describe these contractual arrangements as they have been presented to us and do not make any factual findings or determinations regarding these specific contracts.

GSA entered into a series of contractual arrangements that have led to your questions. In the American Recovery and Reinvestment Act of 2009 ("Recovery Act"), Congress designated $200 million for DHS to use in "planning, design, construction costs, site security, information technology infrastructure, fixtures, and related costs to consolidate the

Department of Homeland Security headquarters." Pub. L. No. 111-5, div. A, tit. VI, 123 Stat. 115, 162 (2009). To implement DHS's plan for a new, consolidated headquarters, DHS and GSA's Northern Capital Region Public Buildings Service ("GSA-PBS") entered into an agreement "provid[ing] GSA access to $198.9 million" of DHS's Recovery Act funds to pay for various elements of the consolidation project (hereinafter "DHS-GSA Agreement"). *See* GSA Letter att. 1, at 2.[2] The Recovery Act provided that DHS's funds were time-limited; after September 30, 2010, they would expire and no longer be available for obligation. *See id.* at 1; *see also* Recovery Act div. A, § 1603, 123 Stat. at 302.

As part of the consolidation project, GSA-PBS sought to secure two contracts for severable services, which would ultimately be funded with the time-limited Recovery Act funds that GSA-PBS had authority to obligate. GSA Letter at 1–2. As noted, severable services are services that are continuing in nature, and from which a benefit is received each time the service is rendered, such as the maintenance of landscaping or repair work.[3] Severable services contracts funded with time-limited funds are in certain respects governed by rules different from those applicable to other types of contractual arrangements.

For example, government contracts are generally governed by the "bona fide needs rule," but there is a limited exception to that rule for severable services contracts. The bona fide needs rule provides that an agency generally may obligate appropriations that Congress makes available for a limited period of time only to pay for "bona fide needs" incurred *during that period of availability*. *See* 31 U.S.C. § 1502(a); 1 General Accounting Office, *Principles of Federal Appropriations Law* 5-11 (3d ed. 2004) ("*Federal Appropriations Law*"). For a service such as routine landscap-

---

[2] The DHS-GSA Agreement indicated that GSA would use the money to obtain nonseverable services, GSA Letter att. 1, at 1, but all agree that GSA ultimately entered into contracts to obtain severable services under the Agreement. We have not considered and do not address whether the DHS-GSA Agreement's original characterization of the money as restricted to contracts for nonseverable services was erroneous or what the consequences of any such error would be.

[3] In contrast, nonseverable, or entire, services are those for which the entire benefit is received at the time the service is completed, such as building construction or other projects that yield a final product. All agree that the relevant contracts here (between GSA's agent—the Federal Acquisition Services component of GSA's Northern Capital Region—and the third party contractors) were for severable services.

ing work, for example, the need arises when grass needs to be cut or hedges need to be trimmed; thus, an agency ordinarily could not enter into a contract for cutting or trimming that would occur after current funds cease to be available. Under a statutory exception, however, agencies may obligate time-limited appropriations for "contract[s] for the procurement of severable services for a period that begins in one fiscal year and ends in the next fiscal year if (without regard to any option to extend the period of the contract) the contract period does not exceed one year." 41 U.S.C. § 3902. In other words, an agency could use Fiscal Year ("FY") 2013 funds, available for obligation only during FY 2013, to enter into a landscaping contract that lasted into FY 2014, so long as the total contractual period did not exceed one year.

To obtain the severable services contracts, GSA-PBS entered into an agreement with the Federal Acquisition Services component of GSA's Northern Capital Region ("GSA-FAS"). GSA Letter att. 2. The agreement specified that GSA-FAS, acting on behalf of GSA-PBS, would acquire technology services from a contractor. *Id.* §§ B.2, B.6. GSA-FAS would pay the contractor's charges upfront with money from the Acquisition Services Fund, a fund established by statute that GSA uses to procure services on behalf of other federal agencies. *Id.* §§ A.7, B.8, B.13; *see* 40 U.S.C. § 321(c). The Acquisition Services Fund is a revolving fund, meaning that it is both a receipt account and an expenditure account, such that collected receipts are available for expenditure without the need for further appropriations from Congress and without fiscal year limitation. 3 *Federal Appropriations Law* at 12-87, 12-88 (3d ed. 2008). The statute governing the use of the Acquisition Services Fund requires agencies for which GSA expends money from the fund either to pay into the fund in advance or to "prompt[ly] reimburse" the fund for expenditures made on their behalf. 40 U.S.C. § 321(d)(3). Consistent with this statutory requirement, the agreement between GSA-PBS and GSA-FAS provided that GSA-FAS would pay the contractor's charges from the Acquisition Services Fund, and then GSA-PBS would reimburse GSA-FAS from the Recovery Act funds DHS had set aside for GSA-PBS's use. GSA Letter att. 2, §§ B.8, B.12. The agreement made GSA-PBS "responsible for prompt payment of all billings" for reimbursement, set forth criteria for determining when billings would become delinquent, and established that delinquency in reimbursement could result in certain consequences

for GSA-PBS. *Id.* § A.7. The agreement also stated that "[GSA-FAS's] acceptance of this document creates an obligation on the part of [GSA-PBS]." *Id.* § B.18.

Under the authority of its agreement with GSA-PBS, GSA-FAS awarded two task orders for severable services on September 30, 2010, the last day that Recovery Act funds were available for obligation. *See* GSA Letter at 2. At least one of the task orders indicated that the performance period would extend from September 30, 2010 to November 2011, longer than the one-year period permitted by the statute that allows agencies to use time-limited funds for severable services contracts crossing fiscal years.[4] *Id.* Midway through the contract, in the summer of 2011, GSA-FAS modified the task orders so that the performance periods of both task orders ended on September 29, 2011, within a year after they began. *Id.*

GSA's Office of the Inspector General conducted a limited scope audit of both task orders and concluded, among other things, that the initial task orders violated both the bona fide needs rule and the Anti-Deficiency Act.[5] The Inspector General concluded that the revolving fund money GSA-FAS obligated by entering into the task orders had "the same purpose and time limitations" as the time-limited Recovery Act funds designated to reimburse the revolving fund. OIG Reports at 3. Because GSA-PBS could not use Recovery Act funds to reimburse GSA-FAS for any charges incurred beyond the first twelve months of the contract, the Inspector General concluded that GSA-FAS had obligated money in advance of an appropriation and thereby violated the Anti-Deficiency Act. The Inspector General further concluded that GSA-FAS could not cure the violation by modifying the task orders' performance periods so that they did not exceed one year.

---

[4] We understand that GSA believes that the performance period for the other task order never clearly extended beyond one year. GSA Letter at 2. We do not resolve that issue.

[5] *See* Office of Inspector General, General Services Administration, Report No. A110024/Q/A/P12006, *Limited Scope Audit of Task Order NP4700101050 Funded by the American Recovery and Reinvestment Act of 2009* (May 2, 2012); *see also* Office of Inspector General, General Services Administration, Report No. A110024/Q/A/P12007, *Limited Scope Audit of Task Order NP4700101051 Funded by the American Recovery and Reinvestment Act of 2009* (May 2, 2012) (collectively, "OIG Reports"). Because the relevant content of the two reports is identical, citations to "OIG Reports" should be understood as citations to the specified pages in both reports.

## II.

As stated above, the Anti-Deficiency Act prohibits "officer[s] or employee[s] of the United States Government" from "involv[ing] . . . [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."[6] 31 U.S.C. § 1341. GSA agrees that an ADA violation occurs when an agency obligates time-limited funds by entering into a severable services contract that exceeds one year. *See* 1 *Federal Appropriations Law* at 5-40 (violation of bona fide needs rule can also violate the ADA). Because there is a statutory prohibition on obligating time-limited funds beyond their period of availability for greater-than-one-year severable services contracts, an agency entering into such a contract would have no funds legally available at the time of obligation to pay for the services it would receive beyond the one-year mark. So, for example, if a landscaping contract obligated FY 2013 funds for a period of time lasting into FY 2014, the FY 2013 funds would be legally available for the first twelve months of that contract. But at the end of that twelve months, FY 2013 funds would no longer be available. If the contract continued beyond that point, it would therefore have effectively obligated FY 2014 funds "before an appropriation is made." 31 U.S.C. § 1341.

The difference between this hypothetical landscaping contract and a contract like the one GSA describes is that, under the latter, the agency does not obligate time-limited funds outright; instead, it obligates revolving funds that will later be reimbursed by time-limited funds. As GSA sees it, this arrangement does not violate the ADA. GSA reasons that an agency generally may obligate revolving funds to pay for severable services for any period of time, so long as money in the revolving fund remains available for obligation. GSA argues that, even though a contract may indicate that particular time-limited funds will reimburse the revolving fund, the reimbursing agency could defer repayment until new time-limited funds become available.[7]

---

[6] The Anti-Deficiency Act applies not only to contracts between a government agency and a private party, but also to contracts between one government agency and another. *See, e.g.*, *Public Printer—Four-Year Contract for Purchase of Paper for Postal Cards*, 27 Op. Att'y Gen. 584 (1909).

[7] After we issued the initial version of this opinion, GSA requested that we reconsider our conclusion. *See* Letter for Virginia A. Seitz, Assistant Attorney General, Office of

GSA correctly notes that the one-year limit on severable services contracts does not generally apply to revolving funds. But we do not believe that general rule applies when an agency obligates money from a revolving fund under an arrangement in which the fund must be reimbursed with time-limited funds. In our view, money from a revolving fund like the Acquisition Services Fund, which agencies are legally required to reimburse, can be obligated only to the extent that the relevant appropriations are legally available for the expenditures made by the fund.[8] *See* Memorandum for the Files from Stephen J. Wilkinson, Office of Legal Counsel, *Re: Federal Register Publication on November 23, 1981* (Dec. 4, 1981). Restrictions on the availability or use of the designated reimbursement funds limit an agency's ability to obli-

---

Legal Counsel, from Kris E. Durmer, General Counsel, General Services Administration (Aug. 28, 2013) ("Reconsideration Request"). The Reconsideration Request argues that, at least with respect to one of the task orders, any contractual obligation exceeding the twelve-month period for which Recovery Act funds were available for reimbursement was, on the particular facts, not an impermissible obligation of Recovery Act funds, but solely an obligation of the revolving funds in the Acquisition Services Fund. *Id.* at 2. On that view, no Anti-Deficiency Act violation occurred because GSA-PBS would have had no obligation to reimburse the Acquisition Services Fund for services that GSA-FAS contracted for on GSA-PBS's behalf that extended beyond the twelve-month period.

We are not in a position to evaluate the particular facts that GSA identified in its Reconsideration Request, including whether the particular contracts at issue obligated GSA-PBS to reimburse the revolving fund for expenses beyond the twelve-month period, in light of our practice to address only general legal questions that have prospective application. We accordingly reach no conclusion as to how GSA should apply our opinion to each of its past contractual arrangements. Our opinion is confined to those circumstances in which one government entity obligates revolving funds that another government entity is legally obligated to reimburse with time-limited funds. We defer to GSA's determination of whether those circumstances arose in its past contracts.

[8] GSA points out that the statute requires the Administrator of GSA to establish rates for services it provides customer agencies and to set those rates "at levels sufficient to recover . . . so far as practicable" certain costs, 40 U.S.C. § 321(d)(2). *See* GSA Letter at 5 n.9. We understand the "so far as practicable" language as an accommodation to the reality that GSA may not always be able to quantify precisely the costs associated with "inventory losses," "amortization . . . of equipment," "transportation cost," and the other costs listed in section 321(d)(2). We do not read this language to suggest that customer agencies must only reimburse GSA to the extent that they have funds available, or that GSA may obligate money from the Acquisition Services Fund that it does not expect to recoup. The phrase "so far as practicable" qualifies the requirement that the GSA Administrator establish prices, not the requirement that agencies reimburse the GSA for obligations GSA undertakes on their behalf.

gate the revolving funds; otherwise, the restrictions on the use of funds could be circumvented simply by channeling their expenditure through a revolving fund. The one-year limit on the obligation of funds for purchase of severable services thus continues to apply when those funds are used to fulfill a legal obligation to reimburse a revolving fund for payment for severable services.

This conclusion is consistent with prior advice of our Office. In November 1981, Executive Branch entities experienced a lapse in appropriations when the President vetoed a continuing resolution. *Id.* at 1. The Office of the Federal Register, an Executive Branch entity, asked whether, notwithstanding the lapse in appropriations, it could request that the Government Printing Office ("GPO"), a Legislative Branch entity, print the *Federal Register* the following day. *Id.* It explained that GPO charges the cost of printing the *Federal Register* to a revolving fund, which agencies must, by statute, reimburse. *Id.* We reasoned that "[b]ecause the agencies are required to reimburse the revolving fund from their own appropriations, at some point in the process the printing of the *Federal Register* creates an obligation within the meaning of . . . the Antideficiency Act." *Id.* We advised the Office of the Federal Register that printing the *Federal Register* would violate the Act if doing so "called for the obligation created by the printing process to be charged to appropriations not yet enacted." *Id.* at 2.

The Comptroller General has taken a similar view.[9] *See Chemical Safety and Hazard Investigation Board—Interagency Agreement with the General Services Administration*, B-318425, 2009 WL 5184705 (Comp. Gen. Dec. 8, 2009) ("*Chemical Safety Board*"). In *Chemical Safety Board,* the Comptroller General rejected a proposed interagency agreement in which GSA would have used the Acquisition Services Fund to pay for an open-ended severable services contract, which the Chemical Safety Board would later reimburse through some combination of FY 2009 funds and future funds. *Id.* at *1, *4. The Comptroller General reasoned that pledging future-year appropriations to reimburse GSA for the obligations it incurred under the interagency agreement would "obli-

---

[9] The Comptroller General's views often provide helpful guidance on appropriations matters and related issues, although they do not bind the Executive Branch. *See Use of Appropriated Funds to Provide Light Refreshments to Non-Federal Participants at EPA Conferences*, 31 Op. O.L.C. 54, 55 n.1 (2007).

gate [the Chemical Safety Board] to pay for severable services to be performed in future fiscal years" and thereby violate the Anti-Deficiency Act. *Id.* at *4. That GSA would use a revolving fund to pay expenses at the outset made no difference, for "[a]n interagency agreement . . . that is funded through an intragovernmental revolving fund, is akin to a contract and the obligational consequences are the same as if it were a contract." *Id.* at *1 n.6.

Our analysis would not change even if the contracting agency did not actually spend revolving-fund money when reimbursement funds were unavailable, but only entered into a contract to do so. The Anti-Deficiency Act prohibits "involv[ing] . . . [the] government in a contract or obligation for the payment of money before an appropriation is made," meaning that the violation occurs when the agency enters into the contract, even if it never spends the money it obligated. *See Public Printer—Four-Year Contract for Purchase of Paper for Postal Cards*, 27 Op. Att'y Gen. 584, 587 (1909) (advising that it would violate a predecessor version of the Anti-Deficiency Act to enter into a four-year paper contract, even though "[t]he four-year contract proposed would . . . not require any expenditure in excess of the appropriation" for the current fiscal year, because "there is no appropriation" for any "paper contracted to be furnished after" the date that current-year funds expire); *see also Online Terms of Service Agreements with Open-Ended Indemnification Clauses Under the Anti-Deficiency Act*, 36 Op. O.L.C. 112, 125 (2012) (acknowledging that commitments made in violation of the ADA cannot be legally enforced, but advising that "[t]he mere fact that commitments made in violation of the ADA are not legally enforceable does not somehow erase the ADA violation").

Our conclusion is not at odds with the Comptroller General's statement that "a naked contractual obligation that carries with it no financial exposure to the government does violate the Antideficiency Act." *See* DHS Letter at 3 (quoting *Funding of Maintenance Contract Extending Beyond Fiscal Year*, B-259274, 1996 WL 276377, at *4 (Comp. Gen. May 22, 1996) ("*Maintenance Contract*")). In *Maintenance Contract*, the Comptroller General concluded that an agency did not violate the ADA by leaving eight months of a twelve-month severable services contract unfunded at the time of the award where that contract included a clause making the government's obligation for the unfunded months "contingent

upon the contracting officer notifying the contractor in writing that funds were available for continued performance and that the contractor continue work." 1996 WL 276377, at *1. Because the agency had made the continuation of the contract contingent on the availability of funds, it had not involved the government in an obligation for which funds were not yet available; it had merely given the government the option to continue the contract should funds become available. When no such contractual contingency exists, an agency violates the Anti-Deficiency Act when it enters into a contract that obligates the government to make payments beyond the period in which funds are available to reimburse those expenditures.

### III.

GSA, joined by DHS, urges that, even if entering into a greater-than-one-year severable services contract would violate the ADA, an agency can cure, if not altogether avoid, the violation by modifying the contract so that the performance period does not exceed one year.[10] While shortening a severable services contract's period of performance may terminate an ongoing ADA violation, it would not undo the violation that occurred when the contracting agency obligated revolving funds in advance of an appropriation for reimbursement funds.

The Comptroller General has long taken the view that an ADA violation can be cured under certain circumstances. *See* 2 *Federal Appropriations Law* at 6-80 to 6-82 (3d ed. 2006). If an agency charges an obligation to the wrong appropriation account, and funds are available in the correct account, the agency may adjust its accounts by charging the obligation to the correct one. *Id.* As long as sufficient appropriated funds were available when the obligation occurred and remain available in the

---

[10] For the purposes of this opinion, we use the word "cure" to mean taking some action after an ADA violation has occurred that retroactively eliminates the violation and makes a report to Congress unnecessary. We use the word "avoid" to mean preventing the violation from occurring in the first place. And we use the word "terminate" to mean taking some post-violation action that stops an ongoing ADA violation but does not eliminate the original violation and accordingly does not discharge the violating agency from its responsibility to report to Congress. We do not suggest that these words are terms of art in appropriations law, but rather define them to make sure our analysis here is clear.

correct account at the time of the adjustment, the agency does not have to report its initial improper obligation as a violation of the ADA. *Id.*

A critical feature of a curable ADA violation, however, is the existence of legally available funds to cover the expenditure *when the obligation occurs*. If funds are not legally available, the agency cannot simply adjust its accounts and thereby correct the improper obligation, because the agency lacked authority to enter into the obligation at the outset. Thus, for example, when an agency charges an appropriation account for a purpose other than that specified in the appropriation, and no existing account is legally available for the charged purpose, the agency violates the ADA in a way that it cannot cure. *Id.* at 6-82. Similarly, when an agency violates the ADA by entering into a contract with an impermissible indemnification provision that exposes the government to unlimited financial liability, the agency cannot cure that violation, because it did not have funds legally available for the obligation when it was incurred. *See Department of the Army—Escrow Accounts and the Miscellaneous Receipts Statute*, B-321387, 2011 WL 1178327 (Comp. Gen. Mar. 30, 2011) ("*Escrow Accounts*"). In the latter situation, a contractual modification that removes the impermissible provision may terminate an ongoing ADA violation, but it does not undo the violation that occurred when the agency involved the government in a contract for which appropriations were unavailable. *See id.* at *9.

Thus, in assessing whether the ADA violations resulting from a contractual arrangement in which one federal entity obligates revolving funds that another entity legally must reimburse with time-limited funds, we would examine whether funds were legally available to cover the obligation to reimburse when the contractual obligation arose. In our judgment, contractual arrangements in which time-limited funds are obligated for reimbursement beyond the twelve-month period permitted by 31 U.S.C. § 1502(a) resemble contracts with impermissible indemnification clauses: No funds are legally available to cover the pertinent obligation at the time it is incurred. The statute governing obligations of the revolving fund requires that the revolving fund be reimbursed, and the contract providing for reimbursement of the fund specifies the use of time-limited funds that could not be obligated for any part of a contract that extended beyond one year.

The Comptroller General decisions that GSA and DHS identify as support for their arguments do not conflict with our view. In one of the deci-

sions, the Comptroller General concluded that a three-year requirements contract violated "the statutory prohibitions against obligating the government in advance of appropriations," with no indication that the agency could cure the violation. *See Appropriations—Availability—Contracts— Future Needs*, 42 Comp. Gen. 272, 272 (1962) ("1962 Decision"); *see also Contracts—Federal Supply Schedule—Multi-Year Procurement*, 48 Comp. Gen. 497, 499 (1969) (explaining that the 1962 Decision concluded that a violation of the ADA had occurred). The Comptroller General allowed the contracting agency to complete the contract "in view of the circumstances of the award," which appeared to include the fact that the contract provided services to a military base on a remote island, but he did not suggest that a contractual modification could cure the violation. 1962 Decision, 42 Comp. Gen. at 278. The *Maintenance Contract* decision, discussed above, does not address whether an agency can cure a violation; rather, it concludes that a contractual arrangement that does not result in any financial exposure for the government does not violate the ADA. *Maintenance Contract*, 1996 WL 276377, at *4.

The remaining three decisions address situations in which no ADA violation occurred or any ADA violation could be cured, but none involves a contractual arrangement similar to the one that we have described. In one decision, the Comptroller General concluded that entering into a lease without legal authority to do so did not result in an ADA violation (though it violated other laws) because appropriations were available to pay for leases at the time of the obligation, and the agency recorded the obligation in the correct account. *See Interagency Agreements—Use of an Interagency Agreement between the Counterintelligence Field Activity, Department of Defense, and GovWorks to Obtain Office Space*, B-309181, 2007 WL 2389756 (Comp. Gen. Aug. 17, 2007). In another, the Comptroller General concluded that an agency could cure an improper obligation of expired funds if it had sufficient current-year funds at the time of obligation to cover the obligation. *Expired Funds and Interagency Agreements between GovWorks and the Department of Defense*, B-308944, 2007 WL 2120292 (Comp. Gen. July 17, 2007). In the final decision, the agency improperly divided payments under a nonseverable services contract over the course of two years, and the Comptroller General concluded that the agency could cure an ADA violation if it could adjust accounts so that it recorded the

entire contract as an obligation for the first fiscal year, and had sufficient funds available to do so. *Financial Crimes Enforcement Network—Obligations under a Cost-Reimbursement, Nonseverable Services Contract*, B-317139, 2009 WL 1621304 (Comp. Gen. June 1, 2009). In each decision, the agency's ability either to avoid or to cure an ADA violation turned on whether sufficient funds were legally available at the time the obligation occurred. When funds are not legally available at the time of obligation so that the agency could correct the violation through an adjustment of accounts, the ADA violation cannot be cured.

We appreciate that modifying an impermissible contract term may prevent an ADA violation from continuing and may prevent the government from actually spending the funds that it obligated in advance of an appropriation. But a contractual modification that prevents improper spending does not by itself cure an initial improper obligation. *See Escrow Accounts*, 2011 WL 1178327, at *9. For that reason, and those explained above, we conclude that an agency cannot cure an ADA violation that occurs when it enters into a greater-than-one-year severable services contract by modifying the contract's performance period.

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*